2001 UT App 63

Sonya L. ATKINSON, Plaintiff
and Appellant,

v.

STATELINE HOTEL CASINO & RE-
SORT, Franklin T. Gammon, O. Lee Sin-
gleton, Billy R. Rodd, Jay Owens, and
John Does Security Officers 1–30, Defen-
dants and Appellees.

No. 991029–CA.

Court of Appeals of Utah.

March 8, 2001.

Robert W. Hughes and John F. Bates, Salt
Lake City, for Appellant.

Stephen G. Morgan, Joseph E. Minnock, Morgan Meyer & Rice LC, and Jerome H. Mooney, Larsen & Mooney Law, Salt Lake City, for Appellees.

Before GREENWOOD, P.J., JACKSON, Associate P.J., and ORME, J.

## OPINION

ORME, Judge:

¶1 Plaintiff Sonya L. Atkinson brought this action seeking damages for defendants' role in a series of events culminating in her rape by a casino patron. Plaintiff appeals the trial court's grant of summary judgment to defendants Stateline Hotel Casino and Resort, Franklin T. Gammon, O. Lee Singleton, and Billy R. Rodd (collectively, the Stateline). Specifically, plaintiff argues that the trial court erred in concluding the Stateline owed her no duty of care absent evidence that the Stateline knew or should have known an assault was about to occur and in concluding that no genuine issues of material fact exist. Her appeal is well-taken, and we reverse the summary judgment.

## BACKGROUND

¶2 "[I]n reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Higgins v. Salt Lake County*, 855 P.2d 231, 233 (Utah 1993). We recite the facts in this opinion accordingly. Thus, when confronted with disputed facts in this case, we state them in the manner most consistent with plaintiff's position.

¶3 On Saturday, April 8, 1995, plaintiff went with her husband and some friends to "Wendover"—two adjoining towns of the same name, one on either side of the Utah–Nevada border. The group had reservations at the Western Motel in Utah and stopped there before taking a courtesy van at about 9:00 p.m. to the Stateline Hotel Casino and Resort in Nevada. During the next four and a half hours while gambling, eating dinner, and watching a lounge act, plaintiff had thirteen mixed drinks, two or three shots of tequila, some wine, and some champagne.

¶4 Shortly before 2:00 a.m., a man approached plaintiff at the craps table where her husband was gambling and asked her to teach him how to play craps. Because this individual's name was not known to the parties until long after this action was filed, he was referred to as "John Doe" through much of the proceedings. We will employ that same usage, although it is now known that the man was Jay Owens.

¶5 Plaintiff spent the next two to three hours at the craps table talking with John Doe and consuming another six or seven mixed drinks. Around 4:00 a.m., plaintiff left the craps table alone and made her way to a table at a nearby bar. John Doe sat next to plaintiff and said he would like to get to know her better. She replied that she was married, but the two engaged in friendly conversation, showing each other pictures of their children. John Doe then bought plaintiff a drink, in appreciation for her teaching him how to play craps. By this time, plaintiff was severely intoxicated. Her only memory between John Doe's buying her the drink and her later waking up in a strange motel room with John Doe was of getting into a vehicle.

¶6 While still at the bar, plaintiff became belligerent and confrontational with several Stateline employees. She put her arms around an off-duty entertainer and an off-duty bartender, spoke loudly in their faces, and tried to kiss them. Stateline security officer Todd Gammon observed plaintiff, decided to intervene, and radioed for assistance. Gammon tried to walk plaintiff to the security office, but she was unable to walk and had to be carried. Gammon's shift leader, Billy Rodd, arrived to help Gammon with plaintiff. Security officer Lee Singleton entered the security office just as Gammon and Rodd got plaintiff seated.

¶7 Rodd posted Singleton at the office door. Within a few seconds, John Doe came to the door saying, "I'm with her." Neither Gammon, Rodd, or Singleton had noticed John Doe with plaintiff at the bar. Singleton told John Doe he could not enter, but plaintiff said the man was with her and that she wanted him let in. Rodd then instructed

Singleton to let John Doe in. As John Doe tried to calm plaintiff down, she kicked him in the groin. Now skeptical of John Doe's relationship with plaintiff, Gammon "tried to get John Doe to step back so [Gammon] could calm her down and talk to her and find out where she was staying and if she was with anybody else." Plaintiff, however, "was just being ... everywhere else" and "not making any rational sense."

¶ 8 Security detained plaintiff for fifteen minutes trying to get information including her last name, but plaintiff was so drunk that security learned nothing but her first name. During this time, John Doe knelt next to plaintiff, holding her hand and talking quietly with her. However, he never volunteered, and security never asked him, plaintiff's last name or his own name. Although trained that, in medical emergencies, they needed no permission to search a person's belongings, security never looked in plaintiff's purse, which contained her Western Motel room key.

¶ 9 Security asked John Doe if he and plaintiff had a room at the Stateline Hotel. John Doe said they did not but would "be obliged to take [one]." When told there were no rooms available, John Doe said, "I do have a room at the Motel 6."[1] Security then questioned plaintiff about having a room in town. During the whole encounter, plaintiff had "not want[ed] to answer anything [security] asked her." "John Doe would have to get her to talk to [security]," and "[h]er answer[s] would go with his answer[s]." Following that pattern, Gammon asked plaintiff, "[D]o you have a room in town?" John Doe then knelt in front of her for a "couple minutes," and "[a]fter a bit of argument [between John Doe and plaintiff] she finally said 'yeah.' " When it became

apparent that security wanted to remove plaintiff from the premises, John Doe said, "Please don't arrest her. I can take care of her." Rodd then decided to transport plaintiff to John Doe's room at Motel 6.[2]

¶ 10 Gammon carried plaintiff, who was "limp" and "dead weight in his arms," outside while Singleton went to get a van. Once outside, plaintiff requested that Gammon set her down, but she could not stand, and Gammon had to catch her. While they drove, plaintiff "propos[itioned Gammon], saying things [like], 'I'll do everything you want me to do. I'm the best thing you'll ever have.' " She also tried to climb into the back seat to get at him, and he had to "put her down." As they approached Motel 6 in Wendover, Utah, John Doe directed security to the rear of the building, and plaintiff voiced her concurrence with his directions. At least one other motel—the Western Motel—was in the immediate vicinity of Motel 6.

¶ 11 After getting out of the van, plaintiff fell and "waller[ed] around on the ground." Gammon picked her up and put her over his shoulder and took her to the motel room. By the time they got to the room, plaintiff had "manage[d] to force herself down the front of [Gammon], ... wrap her legs around him, grind[ ] her pelvis against him, and kiss[ ] his neck." John Doe waited at the motel room door. When Gammon "plopped" plaintiff on the bed, she "lunged" at him saying, "Oh, come on," but, Gammon stepped back, and plaintiff fell face first to the floor. John Doe remarked, "don't worry, I'll take care of her," and security returned to the Stateline property in Nevada.

¶ 12 Plaintiff awakened later that morning naked and in bed with John Doe. When she started screaming, John Doe hit her and told her to shut up. He then raped her for what

1. We recognize that on this point, and others, the record contains conflicting facts. There is conflicting deposition testimony as to whether John Doe said "I do have a room at the Motel 6" or whether John Doe said "We have a room in Motel 6." Indeed, most of the testimony on this subject was to the latter effect. However, Rodd testified, in part, as follows:

> Q. Okay, you just asked him. And he said he didn't have a room at the [Stateline]?
> A. Right.

> Q. And he said, but I do have a room at the Motel 6?
> A. Right.

As we have noted already, we must view the facts of record, as well as all reasonable inferences to be drawn from them, in a light most favorable to plaintiff. Here, viewed in that light, the facts reveal that John Doe indicated to security only that *he* had a room at Motel 6.

2. John Doe never specifically asked security to take plaintiff to his room at Motel 6.

"seemed like forever." Plaintiff recognized John Doe as the man she taught to play craps. John Doe was later identified as Jay Owens. He pled guilty to raping plaintiff and was sent to the Utah State Prison.

¶ 13 On August 21, 1995, plaintiff filed a complaint naming the Stateline Hotel Casino and Resort, Gammon, Rodd, Singleton, and John Doe as defendants. After learning Jay Owens's identity, on June 9, 1997, plaintiff filed an amended complaint identifying him as a defendant. In her amended complaint, plaintiff brought claims against Owens for several intentional torts and claims against the Stateline for negligence, libel, intentional infliction of emotional distress, and punitive damages. The Stateline moved for summary judgment on all claims against it. On February 3, 1999, the trial court granted the Stateline's motion for summary judgment and held, with respect to the negligence claim, that the Stateline had "no duty to protect [plaintiff] ... under these circumstances absent evidence that [they] knew or should have known that an assault was about to occur."

¶ 14 In December of 1999, presumably having determined Owens to be impecunious, and in order to make the trial court's summary judgment on her claims against the Stateline a final appealable order, *see* Utah R.Civ.P. 54(b), plaintiff voluntarily moved to dismiss her claims against Owens. The trial court granted plaintiff's motion, and plaintiff now appeals from the summary judgment in favor of the Stateline.[3]

## ISSUES AND STANDARDS OF REVIEW

¶ 15 Plaintiff raises two issues on appeal. First, she argues the Stateline owed her a duty of care. "The question of whether a 'duty' exists is a question of law, and this Court, which is not bound by the trial court's conclusions, may independently review the issue." *Weber v. Springville City*, 725 P.2d 1360, 1363 (Utah 1986). Second, plaintiff argues that there remain genuine issues of material fact as to whether the Stateline breached the duty she contends existed.

"Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Utah R.Civ.P. 56(c). In reviewing a summary judgment, we accord no deference to the trial court and review its ruling for correctness." *Price Dev. Co. v. Orem City*, 2000 UT 26,¶ 9, 995 P.2d 1237. "Furthermore, because negligence cases often require the drawing of inferences from the facts, which is properly done by juries rather than judges, 'summary judgment is appropriate in negligence cases only in the clearest instances.' " *Nelson v. Salt Lake City*, 919 P.2d 568, 571 (Utah 1996) (quoting *Dwiggins v. Morgan Jewelers*, 811 P.2d 182, 183 (Utah 1991)).

¶ 16 As noted by the Stateline in its summary judgment motion, "[t]he acts leading to [plaintiff's] injury occurred in both Nevada and Utah," and "this normally might lead to thorny choice of law issues." The Stateline, however, relies primarily on Utah case law and asserted below that "the law of both Utah and Nevada is substantially similar in all respects material to [this case]." Plaintiff explicitly adopts in her reply brief the Stateline's observations and has likewise relied primarily on Utah case law on appeal. Thus, because no choice of law issue has been raised, briefed, or argued by the parties, and because of the parties' mutual acquiescence in the propriety of deciding this appeal on the basis of Utah law, we resolve this case under the substantive law of Utah. We refer to case law from other jurisdictions, including Nevada, only to the extent that we find the reasoning of those opinions to be helpful as persuasive authority.

## ANALYSIS

### I. Duty of Care

¶ 17 The trial court ruled that the Stateline had no duty to protect plaintiff absent evidence that the Stateline knew or should have known an assault was about to occur. It is true that a landowner " 'is *ordinarily* under no duty to exercise any care until he knows

---

3. On appeal, plaintiff does not challenge the trial court's grant of summary judgment on her libel, intentional infliction of emotional distress, or pu-

nitive damages claims against the Stateline. Accordingly, the trial court's grant of summary judgment as to those claims will stand.

or has reason to know that the acts of the third person are occurring, or are about to occur.' " *Dwiggins v. Morgan Jewelers,* 811 P.2d 182, 183 (Utah 1991) (emphasis added; emphasis in original omitted) (quoting Restatement (Second) of Torts § 344 cmt. f (1965)).[4] However, when one voluntarily undertakes to render services for the protection of another, the actor also voluntarily accepts a duty of reasonable care toward that person regardless of whether a duty of care existed before the aid was given. *See Nelson v. Salt Lake City,* 919 P.2d 568, 573 (Utah 1996); *DCR Inc. v. Peak Alarm Co.,* 663 P.2d 433, 436 (Utah 1983); Restatement (Second) of Torts §§ 323, 324 (1965). Thus, we need not decide whether the Stateline owed plaintiff a duty of care prior to taking charge of her.[5] Clearly, the Stateline assumed such a duty upon taking plaintiff into protective custody. *See Nelson,* 919 P.2d at 573 (declining to decide whether the city had a duty to fence in a waterway adjacent to a park, but holding that by undertaking to do so, the city was obligated to use reasonable care).

¶ 18 The general duty owed by one who voluntarily aids another is articulated in section 323 of the Restatement (Second) of Torts, which the Utah Supreme Court has adopted as the law of this jurisdiction. *See id.; DCR,* 663 P.2d at 436. It provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise *reasonable care* to perform his undertaking if
>
> (a) his failure to exercise such care increases the risk of harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965) (emphasis added).

¶ 19 Section 324 is a more particularized application of the rule stated in section 323. *See* Restatement (Second) of Torts § 324 cmt. a (1965). Section 324 applies when the one receiving aid is helpless to adequately aid or protect herself. It states:

> One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by
>
> (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or
>
> (b) *the actor's discontinuing his aid or protection, if by doing so he leaves the other in a worse position than when the actor took charge of him.*

Restatement (Second) of Torts § 324 (1965) (emphasis added). Section 324(b) applies directly to the facts of this case, and we adopt it here, with some clarification, as an accurate statement of Utah law.[6]

---

4. Both parties discuss the applicability of section 344 of the Restatement (Second) of Torts to this case. Section 344 explains the duty owed by a possessor of land to protect business invitees on the land from harmful acts by third parties. *See* Restatement (Second) of Torts § 344 (1965). Section 344, and the case law applying it, best describe the duty the Stateline owed plaintiff *before* taking charge of her. Because the injury in this case took place *after* the Stateline took charge of plaintiff, we rely on other more applicable sections of the Restatement.

5. We note, though, that the Nevada Supreme Court has said that "a gambling casino where cash and liquor are constantly flowing may provide a fertile environment for criminal conduct such as robbery and assault." *Early v. N.L.V. Casino Corp.,* 100 Nev. 200, 678 P.2d 683, 685 (1984), *partially overruled on other grounds by Moody v. Manny's Auto Repair,* 110 Nev. 320,

871 P.2d 935 (1994). The nature of the casino business—as evidenced by, among other things, the need to employ a full-time security staff—makes it difficult not to assume that the Stateline would have reason to know that a patron, intoxicated to the point of helplessness, would be in danger of being harmed by third persons. *Cf. id.* at 684–85 (holding, where a female casino patron was beaten by an unknown man while in the restroom, that the nature of the casino's business, the bathroom's location away from crowded areas, and evidence of past crimes on the premises made the assault sufficiently foreseeable to impose a duty).

6. The appellate courts of this state have not previously adopted section 324 of the Restatement (Second) of Torts. Our doing so now, however, is not much of a jurisprudential leap since "[t]he rule stated in [section 324] is [merely] an application of the one stated in [section] 323." Re-

¶ 20 Viewed in isolation, section 324(b) appears to require plaintiff to prove only that by leaving her passed out in a motel room with a would-be rapist, the Stateline left her in a worse position than when she was at a casino bar, surrounded by casino employees. We interpret section 324(b), however, as requiring a plaintiff to prove more than that she was left in an objectively worse position than when the defendant took charge of her.

■ ¶ 21 We note again that section 324 is a particularized application of the more general rule stated in section 323. As an application of section 323, section 324(b) impliedly retains the reasonableness component of section 323. *See* Restatement (Second) of Torts § 324 cmt. d ("Where the actor's conduct has changed the other's position for the worse, the fact that the actor was under no duty ... to render services is immaterial in deciding whether or not he has exercised *reasonable care*.") (emphasis added); *Ocotillo West v. Superior Court*, 173 Ariz. 486, 844 P.2d 653, 656 (App.1992) (stating section 324 applies when "the actor's failure to exercise *reasonable care*, has changed the other's position for the worse") (emphasis added). Thus, adopting section 324(b), but construing it in light of section 323, we hold that when one voluntarily takes charge of another who is unable to adequately aid or protect herself, the actor may discontinue his aid only after taking reasonably prudent steps to ensure the person is not left in a worse condition than when he took charge of her. To be clear, our construction of section 324(b) requires a plaintiff to prove (1) that from an objective view of the totality of the circumstances, the plaintiff was left in a worse condition than when the defendant took charge of the plaintiff, and (2) that the plaintiff's ending up in a worse position is due to the defendant's failure to take reasonable care given the facts the defendant knew or should have known at the time.

■ ¶ 22 The Stateline voluntarily took charge of its obviously intoxicated patron,

plaintiff. By doing so, the Stateline voluntarily accepted a duty to take reasonable steps to ensure that she was not left in a worse position than the one it found her in. The trial court erred in concluding the Stateline did not owe plaintiff a duty of care.

## II. Material Issues of Fact

¶ 23 Because the trial court concluded that the Stateline did not owe plaintiff a duty of care, it never reached the question of whether that duty was breached. The parties have likewise dedicated their arguments on appeal primarily to the duty of care issue. Neither party has provided us a complete analysis of whether, given the facts of record and the existence of a duty, the Stateline fulfilled its duty to plaintiff as a matter of law. We undertake that analysis, however, because we must affirm the summary judgment if the record shows that there are no disputed material facts and, given those undisputed facts, the Stateline did not breach its duty of care as a matter of law. *See Dipoma v. McPhie,* 2000 UT App 130, ¶ 4, 1 P.3d 564 ("This court may affirm a lower court's ruling on any alternative ground ' "even though that ground or theory was not identified by the lower court as the basis of its ruling." ' ") (citations omitted).

■ ¶ 24 Stated more specifically, to preclude summary judgment, the record must show that there are material issues of fact as to whether the Stateline (a) left plaintiff in an objectively worse position than the one in which it found her and (b) exercised reasonable care to ensure that it did not leave plaintiff in such a worse position. Viewing the facts in a light most favorable to plaintiff, as we must, we conclude that material facts remain in dispute and preclude summary judgment.

### A. Worse Position

¶ 25 The Nevada Supreme Court has observed that casino-related criminal activity "such as robbery and assault" is "most likely

statement (Second) of Torts § 324 cmt. a (1965). *See also Barnson v. United States,* 531 F.Supp. 614, 621 (D.Utah 1982) (predicting adoption by Utah Supreme Court of section 324 when "presented with the theory and appropriate facts");

*Flynn v. United States,* 681 F.Supp. 1500, 1506 n. 15 (D.Utah 1988) (citing section 324 and *Barnson's* prediction), *aff'd in part,* 902 F.2d 1524 (10th Cir.1990).

to occur ... in areas ... which are removed from the protection offered by crowds." *Early v. N.L.V. Casino Corp.*, 100 Nev. 200, 678 P.2d 683, 685 (1984), *partially overruled on other grounds by Moody v. Manny's Auto Repair*, 110 Nev. 320, 871 P.2d 935 (1994). The Stateline found plaintiff at a casino bar, a public area, surrounded by Stateline employees. The Stateline left plaintiff passed out and alone on the bed of a motel room in the care of a man whose relationship to her was far from clear. We cannot say, as a matter of law, that the position the Stateline left plaintiff in was no worse than the one they found her in. At a minimum, there are disputed material facts concerning whether, objectively speaking, the Stateline left plaintiff in a worse position than she was in before.

### B. Reasonable Care

¶ 26 Many of the facts of record undeniably suggest that the Stateline acted reasonably by delivering plaintiff to John Doe's motel room and leaving her there. Those facts include (1) John Doe's appearance at the security office saying he was with plaintiff; (2) plaintiff's statement that John Doe was with her and that she wanted him let into the security office; (3) plaintiff's acknowledgment that she had a room in town, which the Stateline could have taken to mean John Doe's room at Motel 6; and (4) plaintiff's verbal concurrence with John Doe's directions that the motel room was on the back side of the building.

¶ 27 Other facts, however, raise questions as to the reasonableness of the Stateline's assumption that plaintiff and John Doe had a preexisting relationship of a sort making it proper to entrust her to his care. Before Gammon took charge of plaintiff, he observed her with her arms around off-duty Stateline employees trying to kiss them, but did not notice John Doe with plaintiff at the bar. When Gammon took charge of plaintiff, she was so drunk she could not walk and was saying only "mumble-jumble gibberish."

When John Doe tried to calm plaintiff, she proceeded to kick him in the groin. Security became skeptical of the connection between plaintiff and John Doe and asked John Doe to step back so they could determine if plaintiff "was with anybody else." [7] Although John Doe hugged plaintiff, held her hand, and talked quietly with her while in the security office, plaintiff's physical advances and verbal come-ons were directed exclusively at the off-duty Stateline employees and officer Gammon. These facts tend to undermine a conclusion that plaintiff's representations, in her drunken state, as to who she was with—or anything else, for that matter—could be reasonably relied upon. Moreover, the fact finder might infer that her brazen behavior toward others, in front of John Doe, should have prompted security to doubt the two were together.

¶ 28 For nearly fifteen minutes, security questioned plaintiff for her last name and where she was staying, yet she remained incoherent. John Doe was present, but he did not offer plaintiff's last name or where she was staying. At some point, security asked John Doe if he and plaintiff had a room at the Stateline Hotel. He told them no, but, rather than providing an explanation that they had a room elsewhere, said they would "be obliged to take [a room]" there if one was available. Only when told that no rooms were available did John Doe volunteer that *he* had a room at Motel 6. Several minutes of "argument" then ensued between John Doe and plaintiff before she acknowledged that she "ha[d] a room in town," although she never specifically said it was the same room as John Doe's. These facts cast doubt on the reasonableness of the Stateline's acceptance of John Doe's assertion that he was with her.

¶ 29 Plaintiff could not stand before getting into the van. She propositioned Gammon and tried to get over the seat at him while in the van, and fell "wallering" on the ground in the Motel 6 parking lot upon get-

---

7. According to plaintiff's expert, an instructor at a security officer academy attended by Stateline personnel, security should also have been skeptical about a preexisting relationship between the two given that plaintiff "was dressed nicely [in a red skirt, red jacket, and a white blouse,] and John Doe was dressed like a construction worker. ... [H]e had boots and coveralls, and things that did not fit[;] the two did not go together."

ting out of the van. Before leaving the Stateline resort, security elicited from plaintiff only that she had a room in town, not where that room was; and there was at least one other motel in the immediate vicinity of Motel 6. Given plaintiff's general incoherence, obvious drunkenness, and preoccupation with Gammon, as well as the existence of another motel in the vicinity, plaintiff's verbal concurrence that the motel room was in the rear of the building does not necessarily go far enough, as a matter of law, to warrant Stateline security dropping her off there in a nearly unconscious state.

¶ 30 What the Stateline *did not* do also points up the existence of material factual questions concerning the reasonableness of its actions. Security did not learn plaintiff's last name. Even worse, they did not attempt to learn John Doe's name or plaintiff's relationship to him. Plaintiff was obviously extremely intoxicated while in the security office, and security was trained to know that they needed no permission to look in a person's belongings in a medical emergency.[8] Furthermore, Stateline security officers were not restricted by the search and seizure requirements of the Fourth Amendment. *See State v. Watts*, 750 P.2d 1219, 1220 (Utah 1988) ("The fourth amendment guarantee against unreasonable searches and seizures protects only against governmental actions and does not extend to the independent acts of private citizens."); *State v. Miller*, 110 Nev. 690, 877 P.2d 1044, 1048 (1994) ("[T]he Fourth Amendment 'is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the government[.]' ") (quoting *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984)). Had Stateline security looked in plaintiff's purse, they would have found, if

nothing more, her Western Motel room key, alerting them to the possibility that she was not staying at Motel 6.

¶ 31 The facts viewed in a light most favorable to plaintiff preclude us from concluding, as a matter of law, that the Stateline took reasonable steps to ensure plaintiff's safety before terminating its custody of and care for her.

## CONCLUSION

¶ 32 It is far from clear that plaintiff will prevail at trial, but she is entitled to present her case to a factfinder. By voluntarily taking charge of plaintiff, a person unable to adequately protect herself, the Stateline assumed a duty of care to take reasonably prudent steps to ensure that it did not leave her in a worse position than the one in which it found her. Under the facts of record, viewed in a light most favorable to plaintiff, we cannot say as a matter of law that plaintiff was not left in an objectively worse position than the one in which the Stateline found her, nor that the Stateline acted reasonably in discontinuing its aid.

¶ 33 We therefore reverse the trial court's grant of summary judgment on plaintiff's negligence claim and remand for trial, or such other proceedings as may now be appropriate. We affirm the trial court's grant of summary judgment as to plaintiff's other claims.

¶ 34 WE CONCUR: PAMELA T. GREENWOOD, Presiding Judge, and NORMAN H. JACKSON, Associate Presiding Judge.

---

8. Plaintiff's expert witness expressed "concern[ ] about the failure ... to determine whether or not there [was] any kind of medical problem with [plaintiff]." He stated that security "had an obligation to look in her purse" to determine if it contained "any prescription drugs she might be taking, any kind of medical warning information that would be in her purse, anything at all pertaining to her physical condition." Indeed, the expert stated that the "obligation to [look into a person's belongings] for any medical purpose" was "part of the curriculum" that was "taught to Stateline security officers [at] The Academy." In a similar vein, Rodd also testified that he had been "taught that it was important to identify the people that [he] had removed."

While we cannot be certain what would have transpired if security had looked in plaintiff's purse, the opinion of plaintiff's expert was that "their failure [to check her purse] is what directly led to [plaintiff] being removed with John Doe and placed together in a situation where it's suggested she was raped."